UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| V. | ) | NO. 2:13-CR-63 |
| | ) | |
| CLIFFORD DENIM | ) | |

## REPORT AND RECOMMENDATION

Defendant Denim is charged in a one-count Indictment with being a convicted felon in possession of firearms. He has moved to suppress all evidence of the firearms seized from his residence on March 30, 2013, and any statements he made to state law enforcement officers on that same date. (Docs. 16 and 17). A hearing was held on August 22, 2013. This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636.

The evidence at the suppression hearing was presented through three avenues. First, the attorneys stipulated that the transcript of a preliminary hearing that took place on May 15, 2013, before a General Sessions Court judge of Hawkins County could be filed and considered by this court as if those testimonies in that transcript were presented to this court. (Ex. 1). Second, the parties stipulated to a factual recitation gleaned from the sessions court transcript and the briefs of the respective parties filed in this court. (Ex. 3). Lastly, the defendant himself testified.

Obviously, the only witness whose demeanor could be observed was defendant. To

put it bluntly, he was not particularly believable; he was vague in many areas, and professed an inability to remember certain matters while remembering others with clarity. His credibility was marginal.

**OVERVIEW**

On March 30, 2013, William Everhart complained to Bean Station Police Officer Christopher Masson that his step-son, Michael Shepard, had stolen firearms and other property from him and then traded that property to the defendant in return for ten pain pills.

Police Officer Masson promptly drove to defendant's residence on Big Hill Road in Hawkins County, where he talked to defendant. Other officers eventually arrived. As a result of his conversation with Police Officer Masson, defendant handed over two of the guns he obtained from Shepard. He finally executed a Consent to Search, resulting in the discovery and seizure of more firearms in his house. Defendant also made incriminating statements to the officers, at least one of which was in writing.

Defendant makes two arguments in support of his motion that all evidence seized from his residence on March 30, 2013, and his statements, should be suppressed. His first and primary argument is that Police Officer Masson and the other officers came upon his property without his permission and notwithstanding that there were six No Trespassing signs posted along the length of his driveway. He contends that this amounted to an illegal entry upon his land in violation of the Fourth Amendment, as a result of which all that

2

followed thereafter was a "fruit of the poisonous tree"[1] which should be suppressed.

Defendant's second (and clearly secondary) argument is that his consent to search his residence was not voluntary, but rather was the result of coercion by the officers.[2]

**NO TRESPASSING ISSUE**

Defendant had his driveway posted along its length with six "No Trespassing" signs. Police Officer Masson and the deputy either failed to see the signs, or if they saw them, they ignored them. In any event, the signs were there. The driveway was gated, but the gate was open. According to defendant, the gate was open on this occasion only because he had just driven out and would be returning quickly.

Defendant's house is not visible from the public road. Defendant has a well, so he has no water meter that needs to be read. He has electric service, and the meter is on a power pole located at his house. However, Holston Electric Corporation now reads its meters remotely through some electronic or radio device, and the meter reader does not have to come to a customer's house. However, defendant testified that the meter reader could drive to his house, if he so desired.

Defendant's mail box is located at the end of his driveway, where it intersects with the public road. He admitted that the mail carrier could deliver large packages directly to his

---

[1] *Wong Sun v. United States*, 371 U.S. 471 (1963).

[2] This particular argument was obscure, to say the least. Assistant United States Attorney Bowman was unaware that this was a ground relied upon by the defendant, and the magistrate judge acknowledges that he too was caught by surprise. But, after discussion, Attorney Bowman agreed to proceed with the hearing and to continue to rely upon the transcript of the officers' testimony presented before the General Sessions Court for Hawkins County.

3

house, the No Trespassing signs notwithstanding.

Defendant testified that family members call him before they come to visit, at least "most of the time."

Defendant seemed to suggest during his testimony at the suppression hearing that these signs had been erected for quite a long time, and that he was something of a recluse who wanted to be left alone. According to defendant's live-in girlfriend, Ms. Holt, the signs had been present for approximately 1-1/2 years and were posted because she had been going through a divorce and she did not want her husband to bother her. Ms. Holt's explanation is by far the more credible.

Police Officer Masson went to the front door of the house, and knocked on the door. Ms. Holt answered the door, telling Officer Masson that defendant was not home. However, before the conversation with Ms. Holt was over, defendant himself arrived.

Officer Masson told defendant of what he in turn had been told by Mr. Everhart regarding the stolen items and his step-son's disposition of those items. Defendant freely admitted that he had the items, stating only that he "wished Everhart had talked to him first." Defendant retrieved two firearms from his house and gave them to Officer Masson, and subsequently gave a written statement that he had purchased the firearms from the step-son for $150.00.

To repeat, it is defendant's argument that Police Officer Masson's and the other officers' entry upon his land in the face of the No Trespassing signs gave rise to a violation of the Fourth Amendment.

4

Officer Masson was investigating an allegation made by a citizen that he had been the victim of a theft, and defendant was then in possession of his property. As part of that investigation, Officer Masson went to defendant's house to "knock and talk," a long-recognized right of the police. *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011). In a knock and talk situation, the resident is free to open the door, or not. *Id*. If he does open the door, he is free to talk, or not. *Id*. And, if the resident is so inclined, he can tell the officer to get off his property. Thus, there was no constitutional impediment to Officer Masson's entry upon defendant's front porch for the purpose of asking to speak to defendant *unless* the No Trespassing signs vitiated Officer Masson's right to conduct a knock and talk. Stated in the way defendant puts it, did Officer Masson's and the other officers' *trespass* upon defendant's property, manifested by their failure to heed the No Trespassing signs, amount to an illegal entry in violation of the Fourth Amendment?

On several occasions, this court has been called upon to discuss the issue of No Trespassing signs in relation to an officer's entry upon a defendant's land.[3] Another division of this court also had a case involving No Trespassing signs which found its way to the Sixth Circuit Court of Appeals, *United States v. Hopper,* 2003 WL 152316 (6th Cir. 2003). In *Hopper*, as here, the defendant alleged that the officers initially came upon his property in the face of several No Trespassing signs, and the officers' ensuing observation of incriminating evidence was the result of an illegal trespass. The Court of Appeals promptly

---

[3]*E.g., United States v. Bryant*, 2:10-CR-108; *United States v. Brown*, 2:97-CR-29.

5

pointed out that the Fourth Amendment protects only against an invasion of a person's "reasonable expectation of privacy." *Id.* at **3. The Court held that there was no violation of the Fourth Amendment "[b]ecause law enforcement officials may encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *Id.*

In *Oliver v. United States, etc.*, 466 U.S. 170 (1984), police officers walked upon Oliver's land, ignoring No Trespassing signs and a closed gate as they did so, after receiving a tip that he was growing marijuana. The officers indeed did see marijuana and, based upon their observations, they procured a search warrant. *Oliver* is an "open fields" case, but the issue is precisely the same as the case before this court.

In *Oliver*, the defendant argued that the curtilage of his home had been extended to the perimeter of his property by virtue of his erection of the No Trespassing signs. In the case before this court, the officer had his initial encounter with the defendant on defendant's front porch, which always has been a part of the curtilage.[4] Therefore, in both *Oliver* and the case here, the officers committed a trespass. The question before this court, as it was in *Oliver*, is whether a trespass *ipso facto* constitutes a violation of the Fourth Amendment.

Just as the Sixth Circuit Court of Appeals in *Hopper, supra*, the Supreme Court noted that the Fourth Amendment protects only those privacy rights which society is prepared to recognize as reasonable. 466 U.S. at 177. The Court found that the placement of No Trespassing signs notwithstanding, "the asserted expectation of privacy in open fields is not

---

[4]*Florida v. Jardines*, 133 S.Ct. 1409 (2013).

an expectation that 'society recognizes as reasonable.'" *Id*. at 179. Further, the Court held that trespass does not equate with a violation of the Fourth Amendment:

> The law of trespass, however, forbids intrusions upon land that the Fourth Amendment would not proscribe. For trespass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest. Thus, in the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.

*Id*., 183.

The Fourth Amendment protects only a person's reasonable expectation of privacy. A reasonable expectation of privacy is that which society is prepared to recognize as reasonable. *Rakas v. Illinois*, 439 U.S. 128 (1978); *Katz v. United States*, 389 U.S. 347 (1967). As sacred as the home is, including its curtilage, society is not willing to accept as reasonable an expectation that a police officer may not come within the curtilage to question a resident of a dwelling to ascertain if that resident has information regarding the commission of a criminal offense. Even in the face of No Trespassing signs, it is not unreasonable for a police officer to intrude upon private property to ask if the resident has any information that will aid in the investigation of a crime.

Defendant relies on *Florida v. Jardines*, 133 S.Ct. 1409 (2013). It is questionable that *Jardines* has any applicability to the case before this court in light of its facts. In *Jardines*, the police had information that defendant was growing marijuana in his house. The police officers, along with a drug-sniffing dog, went to defendant's front door. The dog emphatically indicated that he smelled marijuana within the house. Based upon the positive

7

alert of their drug dog, the officers procured a search warrant and indeed found marijuana in the house. Justice Scalia, writing for the majority, commenced his opinion by saying, "We consider whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." *Id*., 1413.

Justice Scalia described the case before that court as a "straightforward one." The officers were on the defendant's front porch and thus well within the curtilage. *Id.* at 1414, 1415. And taking a drug-sniffing dog into the curtilage was "an unlicensed physical intrusion." *Id.*, 1415.

Nothing is surprising about the *Jardines* opinion, and it is not a new turn in Supreme Court jurisprudence. Defendant, however, seizes upon Justice Scalia's discussion regarding a landowner's implied license for others to enter upon his land:

> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." (citations omitted). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers, and peddlers of all kinds." (citation omitted). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grain legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. (footnote omitted). Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." (*citing Kentucky v. King, supra*).

133 S.Ct. at 1415-16.

It is defendant's argument that his No Trespassing signs constituted an explicit

8

revocation of the implied license discussed by Justice Scalia.

Respectfully, that argument stretches the *Jardines* opinion too far. Justice Scalia went on to say that there was no societal implied invitation for anyone *to bring a drug-sniffing dog onto the curtilage*. For this court to conclude that No Trespassing signs amount to an across-the-board revocation of the implied societal consent necessarily would require a court to conclude that society is ready to recognize as reasonable the expectation of privacy which that revocation entails. As an example, it is impossible for this court to believe that society is prepared to accept as reasonable a right of privacy that would deny a law enforcement officer the right to enter upon property to investigate an anonymous complaint that a child was being abused on that property. To be sure, a court could carve out an exception for anonymous complaints of child abuse on the theory that they amount to an exigent circumstance, but then it becomes a matter of degree. Is an anonymous complaint of child endangerment a sufficient exigency, but a citizen's loss of his valuable property not enough? A crime is a crime, and the police are allowed to enter upon property to conduct a knock and talk. If the resident is unwilling to talk, that ends it, but most citizens assuredly would be willing to talk to a police officer, and this is why society is not prepared to go as far as defendant asks in this case.[5]

Defendant also relies upon *United States v. Depew*, 8 F.3d 1424 (9th Cir. 1993), which held that No Trespassing signs on the defendant's property, coupled with other factors

---

[5]Reading *Jardines* as defendant insists also would result in a conflict between his interpretation of *Jardines* and the earlier *Oliver* case.

(distance of the house from the road, water meter at the road, and others), made encroachment by the officers anywhere on the defendant's property presumptively unreasonable.

*Depew* of course is from the Ninth Circuit and is not binding precedent within this circuit. Defendant, however, points out that the Sixth Circuit in *Hopper* also discussed *Depew* and distinguished it on its facts. Therefore, so defendant argues, the Sixth Circuit implicitly has adopted *Depew's* reasoning.

This court cannot agree with that argument. As discussed in the preceding paragraphs, a landowner's subjective expectation of privacy is entitled to Fourth Amendment protection only if it is one that society would deem reasonable. Again, at least in the opinion of this magistrate judge, society is not prepared to accept that expectation of privacy as reasonable.

**THE CONSENT TO SEARCH**

In a matter of a few minutes of Officer Masson's arrival, three other deputies from the Hawkins County Sheriffs Department arrived, as well as a detective. One of those officers gave defendant a consent to search form, which he signed. The ensuing search revealed eleven additional firearms.

Defendant admitted that he was a convicted felon.

The "Consent to Search" authorized five named officers to search his house, vehicles, and a barn. That Consent recited that defendant had been told of his constitutional right that protected him against searches without a warrant; of his right to refuse to consent to a search; and that if any incriminating material was found, it could be used against him in court. The

final sentence recited that he was giving his permission "voluntarily and without threats or promises of any kind."[6]

A consent is an exception to the Fourth Amendment's requirement for a warrant, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Of course, a consent must be knowing and voluntary for it to be valid, *United States v. Guimond*, 116 F.3d 166 (6th Cir. 1997). Whether a consent was knowing and voluntary is determined on the basis of the "totality of the circumstances," *United States v. Mendenhall*, 446 U.S. 544 (1980). Some of those circumstances are: the defendant's intelligence or lack of intelligence; whether the defendant was informed in any way regarding his rights; and whether the person had any prior contact with the criminal justice system, *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998).

Defendant testified at the hearing that he did not "feel like" he was free to leave. As an illustration, he said that officers accompanied him to the bathroom. He also testified that he felt as if he had no choice except to sign the Consent because the officers told him that "they had [a warrant] on the way and it would be better on me if I would sign it, it would be better if I would just sign the Consent to let them search because if they got there they would have tore it all to pieces." According to defendant, the officers made him sit on a four-wheeler as they searched.

Defendant was a convicted felon and the officers had information that he had guns in

---

[6]Doc. 23-3.

11

his house. Accompanying defendant to the bathroom was an appropriate action, not only for the safety of the officers, but also for defendant's safety. As far as sitting on the four-wheeler was concerned, that was nothing but a combination of ordinary prudence for the reasons just stated and an accommodation to defendant's physical problems.[7] Officer Masson testified at the state preliminary hearing that he never told defendant that he was not free to leave, and the court credits that testimony even without the benefit of observing Officer Masson's demeanor. Perhaps it is more accurate to say that the court does not credit defendant's testimony that he believed he was not free to leave. Defendant is no neophyte when it comes to the police and his constitutional rights. At his initial appearance and then at his detention hearing, the court was told of his extensive criminal history. In 2002, he was convicted of attempted possession of a controlled substance. In 2004, he was convicted of possessing Schedule II, IV, and VI drugs, and with possession of a prohibited weapon. Then in 2005, he was convicted of possessing more than a half gram of methamphetamine, and with manufacturing it. According to testimony at the state preliminary hearing, he also has a conviction in South Dakota. Defendant's suggestion that he simply felt overwhelmed or coerced by the police officers is not remotely believable; he is an experienced criminal, and well-familiar with the procedural matters that comes with that experience.

    Officer Masson testified at the preliminary hearing that he told defendant that the other officers *might* have a Consent to Search form, or they *might* ask for a warrant. He

---

[7]At defendant's initial appearance and at the suppression hearing, defendant wore a back and leg brace, visibly grimacing and audibly groaning as he stood and walked.

12

flatly denied telling defendant that the officers already had a warrant. For the reasons stated above, defendant's assertion that he was told otherwise is not believed.

Defendant is intelligent. He was told of his rights; specifically, the Consent Form told him a warrant normally was necessary, and that he had the right to refuse to sign the Consent. The form told him that any incriminating evidence found during the search would be used against him. And he had multiple prior contacts with the criminal justice system. In short, his Consent was knowing and voluntary.

It is respectfully recommended that defendant's motions to suppress (Docs. 16 and 17) be denied.[8]

Respectfully submitted,

                                      s/ Dennis H. Inman
                              United States Magistrate Judge

---

[8]Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).